The first case we'll hear is DePaola v. Virginia Department of Corrections, and Mr. Hyman. Thank you, Your Honor, and good morning. Max Hyman for the pro se plaintiff below, Mr. Eric DePaola, who has been held in solitary confinement at Red Onion State Prison since so far for the past eight years. And the pre-discovery record in this case, Your Honor, indicates that he will remain there in solitary confinement until his release from prison in 2040. Your Honors, this case presents a narrow procedural error. I know that chart. That's a projection. That's contextual, I'm sure. I'm not sure it's worth arguing at this point. We'll hear you out. It's a provocative opening statement. Well, Your Honor, that's what the state argues in this case. They argued for the first time on appeal. I would submit presented improperly a factual argument for the first time on appeal for the It's about three or four places they provide for that in the regulations, and he can apply for it. And he also was there at level six for over a year, and we've held that type of condition. It's not atypical at all for level six. Level zero is pretty tough. If I could address that, Your Honor. Actually, I think that highlights the genuine dispute of material fact in this case. And the state… What's the fact? The fact is whether Mr. DePaul's solitary confinement is permanent on the basis of his 2009 assault. It's undisputable. The state cites two regulations. That's all we have, isn't it? That's correct. But the regulations that they cite are OP 861.3 and OP 830.2, which are generalized regulations. They do not necessarily govern at Red Onion State Prison. And those state very generally that an inmate who is classified as level S may step down to some levels, level six, level five, level five being the general population. However, on the face of OP 830.8, it makes very clear that level S divides into two different pathways. You're mixing up step down with reclassification. The step down does not apply beyond the IM. You can only step down within IM from zero to six. It says that explicitly. Okay. But in the same regulations, it says you can get out of IM six into SM, and in which case you can step down to the general population. Well, actually, there's nothing in the record that supports that, Your Honor. Now, the state cites a few cases, namely six of them, as examples when an inmate was able to be reclassified from IM to SM. But isn't your real issue is whether or not it's getting meaningful review? That's correct. And tell us why he's not getting it. Well, he's not getting meaningful review because his ICA reviews only determine the privilege levels Mr. DePaul enjoys in solitary confinement. Now, because he is in the IM track and cannot advance beyond the IM SL six pot, his — It can't even be reclassified. I would submit, Your Honor, there's a genuine dispute of material fact on that particular question. It's a legal question to read the regulations. We're not talking about arguing facts. Now, the regulations on — with respect to OP 838 on JA 172, Your Honor, it states very specifically that there are no further step-down opportunities for an inmate classified as IM. And I would also — I understand, but he can be reclassified. In other words, you can — once you get into SM, you can step down in the population. And to get out of IM into SM, you have to be reclassified. And it says here, in reading A, following a successful period in IM or SM, offenders will be eligible for advancement to step down from level S to the first introduction in the general population. At the level six. That's right. And the regulations make very clear that the level six pod for IM offenders is the IM SL six closed pod. There is no other level six pod for IM offenders. That is where they filter it into. Okay. You know, we're arguing about what the text says. We can look at the text. It says there's no step-down for the IM. He can only go from zero, one, two, or six. Right. But he can get out of IM. Well, the district court — I think you're picking up on what the district courts say in its opinion. No, I'm picking up on what the regulations — I'm reading the regulations. I read them all, the whole thing. And I don't think there's a — I would state it has no — it does not appear on the face of the affidavit by J.R. Tripp, which does not speak of reclassification. Instead — Aren't we supposed to — they're all a part of these regulations. Sure. Isn't that the source of whether the system is providing adequate — Yes. Right. I mean, he was in IM six for a year. Mm-hmm. And the IM six would never be held by any court to be atypical. Well, even if there is a way for — even if he could be reclassified to the SM status, we'd still submit that there's a genuine dispute of material fact with respect to the Matthews versus Eldridge factors, as applied in Wilkinson. Well, that's the question Judge Floyd just asked you is, was any review adequate? Yes. But he got a lot of reviews. He did get a lot of reviews. But, again, you're right, Your Honor. The question is whether they're procedurally adequate. And we would submit there's a genuine dispute of material fact on that issue. First, with respect to — On what issue? On whether the three factors are met here. And with respect to the private interest factor, we would submit that, under Nkuma, Mr. DePaula has the same interest in reversing and ameliorating the harms that he suffered, potential harms, even, that he suffered or will suffer in the future by virtue of the solitary — These other cases will apply if we understand what happened in this case. Right. And in this case, he got reviews every 90 days. He went up and down from zero to six. One, two, he was reclassified regularly, shown to these hearings. Right. And so the question is, where was he denied a hearing? It sounds to me not only was he granted a hearing, but they were successful in some cases, and they were unsuccessful in others. Well, I think that the issue here, with respect to meaningful review, then, under the Matthews versus Eldridge factors, is the question of whether Mr. DePaula has any ability to understand or contest the basis for his classification decisions. Now, before the ICA decisions are made, he has no opportunity to contest them. In fact, he only receives the ICA decision basis until after the point it is made. And as we laid out in our brief, those ICA decisions usually set forth in repetition the same perfunctory, non-substantive reason for keeping Mr. DePaula in solitary. Pretty much the same person doing the review. Sorry? Pretty much the same person doing the review. That's right. That's right. There's another issue here. Unlike in Wilkinson, there is a genuine dispute of material fact on this record, whether Mr. DePaula actually is afforded meaningful, multi-layered review. As shown in the record Mr. DePaula offered in his affidavit, that several of the reviews are conducted by the same prison guards, reviewing their own decisions. So there's a structural infirmity on that basis. I've been in the same court for quite a few years, making the same review. Is that a due process violation? I'm sorry, could you repeat? Is that a due process violation to have the same officer doing the reviews? No, not necessarily, but it would be a due process violation or at least fall short under Wilkinson, where the reviews are not multi-layered and therefore subject to a risk of erroneous deprivation. That goes to the second Matthews versus Eltridge factor. His reviews result in changes of conditions, changes of- Sure. It gave me meaningful relief, and he could have appealed them, and I- With respect, Your Honor, there's actually a genuine dispute of material fact as to the appeal issue as well. At JA88 and JA311, Mr. DePaula makes clear that he has no ability to appeal the ICA classification privilege level decisions or- Or the hearings on his step levels. That's correct. Well, that's not the classification. Well, that's- He gets a classification once a year, right? He gets an annual- At ICA. That's right, and there's a genuine dispute of material fact on that issue as well because Mr. DePaula- I thought you said there was a dispute about the 90-day, whether he's getting meaningful during the 90-day. Right, and the 90-day reviews, of course, his privilege levels in progress through the step-down program govern in the hypothetical world where Mr. DePaula is able to be reclassified. Those privilege level decisions govern whether he would be eligible for reclassification. So it wouldn't be appropriate, I think, to write off those ICA reviews as not relevant to the reclassification procedure. No, it is. That's where he gets reclassified. It's explicit in the regulations. Based on- I reclassified there. Okay. Well, I'd like to turn briefly to the Eighth Amendment. Now, with respect to the Eighth Amendment claim, reversal is required under this Court's decision in Strickler v. Waters, and also- Do you think your Eighth Amendment claim is as good as your due process claim? I think they're equally good, Your Honor. You think they're equally good? Yes, especially because the district court in this case made one specific failure. Now, we know with respect to the Eighth Amendment that there are two varieties of an Eighth Amendment claim that can be made as far as mental health. First is that the conditions of confinement create actual harm, or that there's a substantial risk of serious future harm. Now, the district court in this case only analyzed the actual harm component and completely overlooked the risk analysis. Now, Mr. DePaula offered congressional testimony about the specific segregative conditions at Red Onion State Prison that they, quote, can create serious mental illness. That's at JA 315. Also, a study cited within those from Dr. Craig Haney, who's an amicus briefer in this case, which found that no single study where an inmate was held in solitary confinement beyond 10 days failed to reveal negative psychological effects. Your factual disputes could be how intense the lighting is and things like that. It could be any number of those issues on the record, Your Honor. Take a few of them. Sorry? Take a few of them, other than lighting conditions, what would cause actual harm or future harm. Take a few others? I'm sorry, I didn't hear you, Your Honor. Like intense lighting. Yes, Your Honor. All 24 hours. Right. Yeah, we would submit that there's a genuine dispute of material fact as to whether that would create serious future harm. As you know, anyone could guess that severe lighting conditions 24-7 would deprive someone from sleep. And there would be a genuine dispute of material fact as to whether that cumulative effect of loss of sleep could cause severe mental harm in the future. Now, in the case of Putney v. Lincoln, and I believe, Judge Niemeyer, you were on that panel, the court said, quote, by focusing only on the injury appellant actually suffered, the court erred by ignoring the risk of harm posed by depriving someone of a mattress for over four months. And I know you were not a fan of the deprivation of a mattress point as creating an Eighth Amendment claim, but Your Honor did, I believe, agree that it could possibly, or at least the risk analysis was overlooked, and that was a procedural defect in Putney. We would submit the same as here. Now, looking to footnote four in that case, the court said, quote, this court has remanded Eighth Amendment actions in two recent unpolished decisions directing the district court to address the risk of harm analysis. Now, one of those two decisions, Your Honor, is a case, Thomas v. Younce, that's 604 Federal Appendix 325. And, Judge Niemeyer and Judge Floyd, you were both on that panel. That's a case decided by Judge Jones, like the one here, where Judge Jones had decided on the basis of a complaint that an inmate's injury to his knee was not serious, but this court held that he had overlooked the genuine issue as to whether placing the inmate on a top bunk, such that he could fall and injure his knee again, created a substantial risk of serious future harm. We would submit that Judge Jones has again failed to take a look at the serious risk of harm analysis in this case, and that alone would require a reversal. What would you expect to happen if we sent it back? We would request the opportunity to take discovery, which was denied in this case. As we laid out in our brief... We would go to trial. We would like to do that, Your Honor. At the minimum, Your Honor, we'd like the opportunity to take discovery in order to support Mr. DePaula's claims. No, Your Honor, he did not. There was, in fact, no opportunity for merits discovery in this case because the state... He did ask for discovery, and the court ordered it. The court specifically ordered it, and he got that discovery. That's right. No, Your Honor, there was not, and I think that underscores another issue in this case, which is that Mr. DePaula, of course, is a pro se plaintiff and is entitled to be advised of his rights under Rule 56, all of Rule 56, all of his procedural rights. That's right. That's right. Well, I would first note that, Your Honor... I see I'm about to run out of time, if I can answer your question. I would first note that the interrogatories Mr. DePaula submitted were non-merits interrogatories designed only to identify proper defendants for service of process. And that was in order to amend his complaint. That's all he asked. That's all he asked for, but that's all he was advised that he could do. And we did omit this from our brief, but I'd like to bring the court's attention to ECF number 39 in the district court record, where the district court had... So he's up here complaining about something he didn't object to. You're complaining about something that wasn't objected to. Yes, that's right. And we wouldn't expect a pro se plaintiff... Right, and we wouldn't expect a pro se plaintiff to understand their rights. He's on pro se now. He's got one of the best law firms in the world. So if he goes back to you, you fellas will stick with him? We are looking into that, although I can't speak to that because my engagement's only limited to this matter. It's something that we've definitely looked into. And had I been Mr. DePaula's attorney below, I certainly would have made a Rule 56D request, which, by the way, according to Davis, is required in a case such as this. They must advise the plaintiff of, quote, the right to undertake reasonable discovery in an effort to produce a triable issue of fact. It's very clear from that decision that that wasn't provided in this case. And that's a... The court, in order to issue a summary judgment, has to go and advise them about the various rules of procedure and the forms of discovery and what can be asked on discovery? No, just literally... The problem you have in this case is the man knew about discovery and he submitted an interrogatory. And so he had some familiarity that he can pose discovery. And that's the only discovery he requested. And he didn't object and make a request that was turned down. Actually, the court granted his request. Right. So it's hard on appeal for us to say that the court should have advised him about some fact that later might have helped him... Right, right. ...when it was never presented below, never objected to. I fully understand Your Honor's point of view. But I would submit that the argument that a pro se plaintiff can't complain about a lack of discovery unless they made a Rule 56D request... No, I didn't say that. ...is to treat him like any other plaintiff. Some objection, some request. The point is he knew about all of his various conditions and reported them in a lot of detail. Even the various classifications of various hearings and so forth. Right. Anyway, okay. You can resume this on your rebuttal. Thank you, Your Honor. Yeah. Cox. May it please the Court, Trevor Cox from the Virginia Attorney General's Office on behalf of the Department of Corrections and the 33 individual defendants. Your Honors, this case is another example of the intractable problems of prison administration where the Supreme Court has directed this Court to defer to the professional defense attorney and to the professional defense attorney Here we have an inmate who is subject to... Did you say Turner takes care of this? No, I think not Turner, but certainly the idea is there, but I think it's throughout the jurisprudence, including in long-term administrative segregation, where this Court held, and I think you joined in that decision, Your Honor, in the difficult and dangerous business of running a prison, frontline officials are best positioned to foresee threats to order and to fashion responses to those threats. Here we have an inmate who stabbed a prison guard with a shank and for that reason was held under more restrictive conditions, and even under those conditions, as he has gone back and forth... How many times has he stabbed a prison guard? You mean in that one incident or subsequent to that? Well, how many different incidents were there? There was that incident... More than one, pardon? He was convicted for the incident... I couldn't tell you whether you said guards or guard. He was convicted of maliciously wounding a prison guard and he was convicted down in Wise County. That's right. And were there more than one incident that he was involved in? Not that's in the record of actually stabbing somebody, but in 2016, even while he was under the restrictive conditions, a sharpened shank was found in his cell. Okay. So it was only the one stabbing incident that he was prosecuted for. That I'm aware of and that's in the record. It is record. That's what we're talking about, it's a record. Correct. But that is enough to certainly put prison officials on notice that they... And you say he had a weapon and one other time. That's correct. Any others? I think there were some other smaller, less worrisome incidents. You think or there were? There were. I think there were possession of contraband, a tampering. On this record, how many were there? I believe there were two or three. If you'd like to go through them, I'd... You're still getting indefinite witness. It was between two and four, Your Honor. But I will say that none of those were minor incidents. They weren't violent. But the stabbing of a prison guard... Pretty bad stuff. I agree with that. Pretty bad. And prison officials... He was prosecuted for it. He got an extra 10 years or something. That's correct. But the prison can't put him back in the general population. That's why these restrictive conditions are required, in order to keep safe other prison officials and other inmates. If we weren't here on this case and he was in general population, we might be up here on another case where an inmate would allege that prison officials were deliberately indifferent to the risk of having this guy out there. Do you complain in this case that he was improperly classified in IM? He does question why he was put in the IM pathway. But to Judge Floyd's point... That's correct. And he wants to be in the SM pathway because he believes that's his only way out. But as Your Honor pointed out, there are many different reviews that occur. And I would direct Your Honor as well to... I just want to know what the nature of his challenge is. You're saying that he is challenging the actual classification, the initial classification. In other words, IM has a list of criteria. Yes. It looks like he satisfies those criteria. But is he challenging the application of those criteria to put him in the IM? I believe so. It's difficult to tell at times, but I believe that he questions why he was put in IM instead of SM, because he believes that forecloses his ability. What's his argument? What do you understand his argument to be on that? That he was not given a proper opportunity to say why he should be in SM or in the general prison population. He believes that he's stuck in IM forever. I'm asking the initial classification. I'd like to just focus on that. Sure. Whether he is properly put under the regulations in IM and whether he challenges that. You obviously argue he's properly classified. My question is, had that initial classification, when he was changed from SM to IM, it was based on the criteria and the regulations, and the question is, what does he object to on that? Or what's your understanding of what he objects to? I can't say I don't know. Maybe counsel would be able to say, but I do know that he objects to being IM, despite fitting the criteria for having a history of extreme violence and causing concern to prison officials that this person should not be out in the general population and needs time to learn corrective behavior. And that's the whole idea of the step-down program, is to ease people back from segregation down to the general prison population. As the record shows, Mr. DiPaola has progressed through the IM pathway. How long has that program been in place in the Virginia system? I believe it was instituted in late 2012 or early 2013. And to Judge Floyd, I know you had a little concern about the meaningfulness of the review. I think the fact that he has gone back and forth through the IM pathway and his changes in privilege level correspond to documented behavioral issues shows that it's a meaningful review. There's plenty of opportunities for officials to discuss with him the progress that he's making in the IM pathway. Judge Niemeyer, I wanted to make sure, because you seem to recognize in the operating procedure that he can be reclassified at any time. And on JA-174, it spells out exactly how an external review team comes in on an annual basis. And the first question that they ask is, is the offender currently appropriately assigned to level S? So not even are they correctly assigned to IM or SM. Are they even supposed to be in this whole level S program altogether? And if they're not, they can be reclassified immediately. And then the second question is, does the offender meet the criteria for the IM or SM path to which they are assigned? And then thirdly, has the dual treatment team made appropriate decisions to advance the offender through the step-down process? So it strikes me on his maintenance claim that he made some factual allegations that go to either actual harm or future harm. And they were just kind of, I mean, passed over. Like the lighting situation, his mental condition. There were a number of things that he left away. He does allege, I think it's JA-94. The question is, is there a material fact that would warrant the case to go forward? What I would say, Judge Floyd, is that he alleged in very conclusory fashion mental illness. Doesn't say what mental illness is. Doesn't say how it is affected by these conditions. And then at the summary judgment phase, he didn't put forward any evidence to identify what that mental illness was. There was no diagnosis presented. There was nothing in the declaration that I saw, and maybe counsel can correct me on that, nothing in the declaration or any competent summary judgment evidence that backed up the allegation that he has mental illness, whatever that means. He does allege there loss of sleep. And that's the only sort of alleged lack of a basic need that I could identify as well. But that's not a serious deprivation that amounts to an Eighth Amendment violation. I mean, I think that's rebutted by the record as well, that I don't think you can look at the privileges that he gets and say there's no human contact. I mean, he's got constant contact with security, prison officials. In the IM pathway, if he makes his way up, he can go to programming in small groups. He's had a job when he was in the closed pod. He worked for 30 hours a week outside the cell. So there's lots of opportunities. I mean, even the reviews themselves that happen on a weekly basis and 90-day basis and annual basis, he's talking to prison officials. He is talking to other – he does have the opportunity, if his behavior warrants it, to be trusted with other inmates. He gets phone calls. He gets visitation. He gets radio and TV in his cell and other programming. So I don't think you can look at this record and say that this is an Eighth Amendment violation because he's been denied a basic human need. I mean, that was the first – Judge Floyd, that was the first factor in Wilkinson. The second one was the no serious deprivation of mental health, and we don't think that the allegation of headaches and anxiety rises to that level. And I think this court so held in long-term administrative segregation where the plaintiffs put forward affidavits saying these conditions, which are even more restrictive than here, are aggravating my mental illness and talked about in great detail what they were suffering. And this court said that's not enough. And this court doubled down on that in Williams v. Branker later where the person was in segregated confinement for over a decade. And then the third Wilkinson factor is the length of duration of the conditions. And Judge King, you'll probably recall from In re, long-term administrative segregation, that the court held there the indefinite duration of the inmate's segregation does not render it unconstitutional. So for all those reasons, we don't think there's an Eighth Amendment violation either. Thank you, Mr. Cox. John. Thank you, Your Honor. Just a few points. Judge King, to your earlier question, I've just gotten approval from my partner to represent Mr. DePaula after the appeal to the extent that that's relevant. With respect to the deference question. Nonetheless, we appreciate your service on this level. Absolutely. With respect to the deference question, Turner simply doesn't apply here. And there are a few reasons why. The Turner analysis mostly applies to First and Fourth Amendment cases. And the reason why is because extra additional deference considerations are not already built into the elements of those claims. They are built in, however, to Eighth Amendment and procedural due process claims. That's clear from the Supreme Court's decision in Johnson v. California. It's also clear with respect to the Eighth Amendment, where the Supreme Court stated very succinctly that Turner does not apply to Eighth Amendment claims because the deliberate indifference prong element of that claim incorporates all necessary deference. It's also the case with procedural due process, as evident from the case of Sandin v. Conner, which created the atypical and significant hardship test in order to account for any necessary deference. So the State's submission that they're entitled to any additional deference is not only improperly raised for the first time in this appeal, it's also meritless. Now, the other issue I'd like to bring up is, again, with the reclassification procedure, we believe there's a genuine dispute of material fact. Because, again, if the annual review process is supposed to be a measure by which Mr. DePaula can be reclassified... Is that what you want discovery on? Yes, Your Honor. We believe that, and we have reason to believe, that with the opportunity for discovery, we can provide a yes-no answer to this question of whether I.M. inmates can actually be reclassified. All we need to do is just have the opportunity to put some of these gentlemen under deposition and serve proper interrogatories crafted by attorneys, and document requests. We'd be able to get an answer to that question quite easily, I think. The other issue with respect to 5%ers, 5%ers is not an obstacle to Mr. DePaula's Eighth Amendment claims. There's a reason for that. First is that 5%ers only states that an inmate may not simply proffer evidence that the conditions of confinement are isolative or restrictive. It must show that those conditions of confinement give rise to some serious harm. In that respect, this Court's decision in 5%ers is simply an application of Strickler v. Waters. I'd like to direct the Court's attention to footnote 4 in that decision, where the Court made clear that a mental harm claim, it's not simply enough for an inmate to state that conditions of confinement create simple anxiety. It must show that the conditions of confinement create mental pain and suffering. Mr. DePaula has done that in this case, at least with respect to the risk analysis, but also with respect to the actual harm issue. And he's done that by stating mental illness. Now, mental illness is not the same as great stress or simple anxiety, especially given Mr. DePaula's secondary sources, which give light and shade extra context on what he means by mental illness. It could be, I believe it's at JA 327, mental illness may consist of hallucinations, may consist of mutilation, suicide. This is in the record in this case. So when Mr. DePaula states mental illness, we'd submit that given the liberal pleading standard, as a status of pro se, and all inferences to which he's entitled, mental illness means as serious a mental illness an inmate could suffer in solitary confinement. And we believe that there's plenty of evidence on that point. Let's see. Oh, yes. Now, as far as... I believe defendants have picked a bone with whether Mr. DePaula has been deprived of basic human need. I would submit that he's been deprived of the same basic human need that Judge Jones recognized could be deprived of an inmate in solitary confinement when he stated in the Latson v. Clark decision six months after he disposed of Mr. DePaula's claims in this case that the inmate had stated a substantial risk of serious future harm that he would be deprived of his basic human need for sanity. That's Judge Jones's own words, by the way. And I would submit that the primary difference between this case and Latson v. Clark is that Latson was represented by counsel and Mr. DePaula has not been. So unless this Court has any further questions, we ask the Court to reverse and remand for further discovery. I appreciate it. I do know that you're court-appointed, and as you know, that's a very important service. We're very appreciative of it. I want to recognize that. Thank you, Your Honor. We'll come down and brief counsel and proceed on to the next case.
judges: Paul V. Niemeyer, Robert B. King, Henry F. Floyd